Your Honor, this is an interesting case from a variety of perspectives, primarily because the appeal deals with Jones' activities on seaworthiness issues and additionally deals with maintenance and cure issues. Willie Meche was a gentleman with a third-grade education, barely literate under most circumstances outside of a limited ability to read or write, but he had 42 years of experience on the water, and in the present situation, he was hired originally by Moncal Well Service or Moncal Marine on November 29, 2006. What's critical in this situation, really relative to both the issues of maintenance and cure in the case as well as the training that goes towards the negligence issue in the case under the Jones Act, is that there was a sale that existed between Moncal and Key Energy. Moncal sold its entire marine division at some point along the way to Key Energy. Now, when did that happen? That happened in 2007, Your Honor, and just after that, on November 30, 2007, is when Mr. Meche was required by Key Energy to fill out all new paperwork. Now, what's critical is that in his personnel file, he completed a new application. He completed consents to undergo a physical examination again. He executed medical records authorizations. He executed a notice to disclose those health records again. He basically did everything that Key asked him to do, and then Key failed to have him undergo a pre-employment physical. Now, Key, at this point, is asking you to rely on Moncal's pre-employment physical, yet at the same time, they want to talk out of the other side of their mouth and identify that, well, we want to rely on Moncal's documentation, but we think our decision would have been different based on that documentation, which leads to, I guess, the crux of the issue is whether or not this sale changes the requirements that Key has to follow in order to assert the McCorpin defense relative to maintenance and cure. Did the application he filled out with Key have a blank for whether he had any prior claims? No. Nothing about that? No, sir. No, sir. And that's what Judge Heick, I believe, focused on whenever he issued his ruling relative to the maintenance and cure issue in this case. What happened after that is he worked for approximately a year and a half. The sale occurs. He gets hired by Key. He continues to work. So after the sale, he worked for about a year before he got hurt? No, sir, not quite that long, about six to seven months. Okay. Effectively, at that time on June 20th, 2008, the rig 102 is under tow towards Eugene Island. Now, initially, there was a discrepancy over specifically where he was asked to move the boats that were tied to the side of rig 102. While the vessel was under tow, there were crew boats, one of which was the MV Miss Catherine, of which he was the pilot. While it's under tow, Alex Ducey, while everyone else is asleep, is the night tool pusher. He asked Willie Mesh to move the boat from one side to the other. Apparently, due to the wind or other items affecting basically the course and navigation, Willie Mesh identified that he believed they were blown off course, and as a consequence, the crew boats began to bang against the side of the rig. So as a consequence, he would drive them back around to the other side. Now, the issue that the defendant has raised relative to this is that he was ordered to move the crew boats. He wasn't ordered to, at that point, service the crew boats after he moved them, and they have effectively argued, at least at the trial court level, that this was not an order. However, the issue is not whether or not that was part of the order. It's whether or not it was part of his job, and he identified clearly, first in his statement the day taken after the accident, in evidence that the defendant submitted, that he very specifically, each and every time he used the vessel, had to lift the hatch, go down below, and service the engine and put oil. Well, why? Because he identified that every day this boat leaked five gallons of oil because the engine needed to be overhauled, in and of itself an unseaworthy condition. However, he was asked to do this at night, and he identified, as did Jimmy Dupre, the senior tool pusher, that historically, when they were under tow, they would cover the lights that would come back and shine on the crew boats from the rig and other things, so he was flying blind, effectively. Not to mention the fact that he was unmanned because he couldn't see. He was by himself. At the point where he tied the boat up, a wave struck the vessel. He was thrown, in his opinion, over the side of the railing, partly onto the deck of the rig, partly onto his own boat. I understand that was his version. The district court didn't accept that, though. Your Honor, I would agree with you on that to a certain extent, but one of the problems at the trial court level is the trial court relied on two pieces of evidence to identify an inconsistency in the versions given that actually weren't in evidence. It identified in Bertrand Mesh's deposition that he gave a different version to his son. That was not in evidence. He additionally identified in his deposition, given in this matter, that he may have given a different version. Neither of those documents were in evidence, and that's one of the errors that we identified to this court, is that effectively, it appears that there was some sort of a disconnect between the time the trial— How did the judge have them if they weren't in evidence? I guess the entire record in front of him, Your Honor. I don't know. Okay, and so can the judge not consider or take judicial notice of the record? I would think the judge can take judicial notice of the record, but I don't know that the judge can rely on evidence outside of the trial record in order to come to his or her decisions at that point. I mean, at least not according to Rule 702, I had thought. What I had identified, Your Honor, is that effectively, the judge relied on evidence that was not presented at trial. The only testimony, for example, that Bertrand— But I'm not understanding how this got to him, because typically you don't file depositions. Did you all just file the whole deposition, or how did the judge have this to rely on? Your Honor, I believe Mr. Opposing Counsel, I think, relied on certain excerpts from the deposition to cross-examine my client. However, it was never admitted. It was never— Okay, but physically, I mean, how did the judge have— If the judge is looking at page 10 of deposition that nobody's ever brought up, how does the judge have page 10 of the deposition? That's what I'm asking. I don't know, Your Honor, to be quite honest with you. The only thing I can— Well, doesn't that make a difference to your argument on whether it's in evidence or not, if it's in the record, this and that, whatever? It does, but at the same time, I don't know where the judge would have gotten that document at all. Okay. If he used it to cross-examine, why isn't that in the record? He didn't ever have it admitted. He may have impeached him with certain excerpts, but he never impeached him with that excerpt in and of itself, nor did he offer it into evidence at that point. There may be testimony in the record by the client as well as cross-examination by Mr. Robinson. Wasn't there some evidence that was in the record, though, like accident report that he signed saying that he hurt his back lifting the hatch? That's undisputed. There is no dispute that he hurt his back while he was lifting the hatch. And there was nothing in that report about him getting thrown against the rail or thrown? No, sir, there wasn't. So why isn't that inconsistent? I don't know that that's not inconsistent. If you ask me, that sounds more incomplete. I mean, historically throughout the case, his statement was taken the day after the accident by a gentleman named Brian Hovey, and he identified to Mr. Hovey exactly what occurred. I mean, the only discrepancies that I have seen reading these various inquiries into what actually occurred is exactly where he fell. There was discrepancies over whether he fell over the railing or between the railings, but there's never been any inconsistency by my client that, A, the weather was adverse, B, he was ordered to go on the boat, or C, that he fell as a consequence of lifting the hatch when a wave struck the boat. I mean, this is a gentleman as I'd identified. I mean, if you fill out an accident report and you don't put in the main fact that you think caused your accident or you say sometime later caused your accident, then I'd say that's pretty significant. If he had filled it out by hand, I'd agree with you. However, the version that— Did he sign it? No, sir. The accident report is not executed by my client. It was, in fact, it identifies Jimmy Dupre, the tool pusher's name at the bottom, and Mr. Dupre said, I didn't complete this. It's a typed-up, printed-out version. Okay. He identified— I assume the tool pusher said was—he put down on the report what the plaintiff told him, Mr. Mesh told him. My understanding is Mr. Dupre identified he didn't complete that report. When he testified at trial, the question posed to him was, do you understand how Mr. Mesh was hurt? He said, yeah, he was on the boat servicing after he was asked to move it, and he said when he picked up the hatch, he injured his back. Of course, the judge heard Mr. Mesh testify too, so it sounds like he didn't believe much that he said about that accident. He may not have, but he still found that an accident occurred, Your Honor. I understand. In fact, that's one of the points of contention by the defendant. So you're dealing with a situation where we have a finding of fact by the trial court after hearing all the evidence that an accident did, in fact, occur. The question becomes, in the plaintiff's mind, is what was the application of the law to those facts as established? And under the most recent pronouncement by the Supreme Court in McBride, and Justice Roberts'—I guess his articulation of what the standard is, and we all know it's, you know, no matter how slight in causing or bringing about, he says the sky's the limit. And that's the plaintiff's point, Your Honor. Had he not been placed in that position to go onto the boat at night, when he said when he saw the boat initially that he had to get in, the waves were so rough either due to the wake or due to the weather or due to a combination thereof that he could see the prop coming in and out of the water. So he's asked to get on that boat, move it on two different occasions. And that was a contested fact, too, about how rough the weather was. Yes, sir, it was. Wasn't that found against you also? That was a finding against me as well. You're correct, Your Honor. The judge apparently relied on Rob Perillo's report that identified that the accident occurred at Eugene Island Block 7. All right. Well, let's say that the trial judge's fact finding is not clearly erroneous, and what you have is an accident that occurred when the plaintiff picked up a hatch, which is one of his regular duties, to check the oil, and he hurt his back. I mean, isn't that what you have if the fact findings are supported? Yes, sir, I would agree with you, but I also think you have an unseaworthy condition. It's causing him to check, A, the engine each and every time he uses it. He specifically asked for assistance from Terry LaBeouf, the other captain who was asleep at that time, and it was refused by Alex Ducey. He additionally asked that the tow be stopped or at a minimum be slowed down. Jimmy Dupre, as well as Mr. Mesh, offered the alternative method of how to handle this at trial, and he said Jimmy Dupre typically would stop the tow, you'd release the crew boats from the side of the rig, and they would follow it. Now, they were pretty close at the time of the accident to where they ultimately wound up. However, the biggest distinction, and I think this would be the explanation for why the only person that seems to know what the weather was like was Mr. Mesh, was that Rob Perillo's report identifies that at 1130 p.m. they were at Eugene Island Block 7, but the vessel log from the MV Tiger Pride, which was the tugboat pushing. I hate to interrupt you, but I think your most serious issue here is whether you can support the maintenance and cure award, so I think you better get to that. Yes, sir. Now, I want to ask you about the McCorp and defense. I mean, do you have any – I mean, I think, as I understand it, he put on evidence that it relied on the application made to Monclaw where he said he'd never had a back injury, never had a prior claim, and they looked at the Monclaw records and saw that they followed the same essential procedure that Key did, so they didn't redo the examination. They took the examination made earlier. Now, why isn't that reasonable for them to do? Well, I think the evidence actually contradicts that to a certain extent. I think first the plaintiff testified as well as his son testified that they actually disclosed to Mike Martins orally there during the orientation and during the day he filled the application out for Monclaw and during the day he took the test that he had a prior disability, that he had prior claims, that he had a prior back and neck injury. Well, but I mean why couldn't they rely on the written material? Written materials? Yes. Well, I think they did to a certain extent. I think when you look at the pre-employment physical and you look at the notation, it identifies that the young lady that evaluated him actually saw that there were problems associated with this gentleman. At that point, she picked up the phone and she called Larry Beaulieu, who was the HR supervisor and who was Mike Martins' boss and supervisor at that point. She told him, this guy's got neck and back problems. This guy's got issues. Is it a problem for you? He said, no, he's going to be a boatman. He said he's not going to be a forehand. And as a consequence, they made him aware at that time. So you have disclosure at the initial level to Mike Martins. The judge didn't credit that testimony, did he? The judge did not identify in his reasons for ruling one way or the other. He heard, obviously, all of it, but he didn't identify in the reasons for ruling one way or the other whether or not he credited or discredited any of that testimony. He simply, I think, in his reasons for ruling, identified that Key never performed its own pre-employment. I think the judge said, as a matter of law, Key couldn't rely on Monklaus. Let's say if we disagree that Key cannot rely on Monklaus. In other words, if we say Key could rely on Monklaus records, do we need to send it back for the judge to make findings on all of this other stuff, the oral history and the phone call and all of that? I don't know that you do to the extent that there's testimony in the record that I thought the court had relied on from Larry Beaulieu identifying that he was aware of these conditions and that he specifically said it was okay to have that. But if the judge didn't make findings because the judge concluded you couldn't rely on that, then do we need to get those findings made, or what do we do if we say that Key could rely on Monklaus documents? If you'd be right, I think you may have to remain in court. Okay. You're out of time, but I want to think about this when you come back up. On the penalties and attorneys' fees, why wasn't it reasonable for the employer to not at least why was it malicious and reckless for them not to reinstate maintenance? If a plaintiff waits four years to update the medical and make a demand for maintenance and cure. So think about that and talk to me about it on rebuttal. Okay, Mr. Robinson. Good morning, Your Honor. George Robinson for Key and Mr. Doucette. Judge Haynes, you had some questions, Mr. Daniel, about how the judge got the information about the different versions of the story. On my cross-examination of Mr. Nash, I used his deposition that my partner had taken, his original deposition, but he never denied any of the prior inconsistent statements on the record in this trial, so I didn't introduce the deposition. How did the judge have it? Because he was admitting it. For example, did you, Mr. Nash? No, but he's saying that there were parts. So you read from page 5, but the judge relied on page 10, and my question is how did the judge have page 10? I don't know that the record supports that, Your Honor, because I read my cross last night, and just about either he said, well, I'm not sure about that, I don't know, or yeah, I guess I did say that. Now, I cross-examined him from the deposition in this case, and I crossed him on the deposition in the T.L. James case. Okay, so you're saying you read it into the record by virtue of impeachment so the judge didn't independently come to the deposition, somehow come into possession. I think Judge Hite's findings of fact on the negligence issue and unseaworthiness are fully supported by the record. Judge Davis, one housekeeping matter. I've got to do my entire argument in 20 minutes, right? Yes. Okay. Okay, so then let me ask you this other issue that we just were talking about with your opposing counsel, which is if we were to rule that Key was entitled, by buying the whole division from Mokla, was entitled to kind of step into Mokla's shoes, do we need to send it back to Judge Hite to make findings about whether Mokla was on notice of this prior back injury and all this whole discussion we just had? Mokla denied that on the record. I think it was Mr. Martin's testimony, I believe, and Mr. Boyer, perhaps, whose deposition was put into the record. Right, but the problem is, as I understand the record, and you can correct me if I'm wrong, Judge Hite never made a finding because he said it didn't matter what happened with Mokla, Key should have done its own thing, so I'm going to look at it as a nondisclosure kind of deal and not a concealment kind of deal. And I'm saying if we disagree with that legal conclusion, then what is the remedy because we seem to have disputes about what happened at Mokla? Your Honor, the testimony, there is testimony from Mokla. Mr. Martin said he never told me that, and the testimony is also very clear from the Mokla people that had they known about the prior neck injuries, back injuries, and that he was on prescription medication, he would not have been hired. As simple as that. Judge Haynes, I couldn't find, and my partner and I couldn't find any case law dealing with this issue of the purchaser of the assets where the plaintiff is doing precisely the same thing with the same equipment, whether they can rely on the- But they took a brand-new application from him when they hired him, when they bought the company? When they bought the assets, Judge, they did. But I don't think they required him to get another physical because Mr. Ken Houston's testimony was that the hiring practices were very similar. But there's no questions on the application about prior injuries that Key took from him? That's my understanding, Your Honor. So how would they ordinarily have that information on a new hire? Well, I think the record shows that they did have the Mokla application. They got the paperwork. Okay, but if somebody came off the street, I show up to be hired, how would they find out about my prior history? I've never worked for Mokla. I'm off the street applying to be a Key employee. What would they do with me? Your Honor, I think the record is clear for Mr. Ken Houston's testimony, and one other witness is that they would send you for a physical. Okay, and the physical is one I would be asked by the doctor precisely about? Fill out the questionnaire. And the questionnaire would include the stuff about the back? Yes. So that's what didn't happen here because they relied on Mokla? Well, they relied on the Mokla questionnaire, which as to prior back injuries, no. Prior neck injuries, no. Work-related illness or injury, no. And are you taking any kind of medication, including prescription drugs, no. And his medical history goes back for about 38 years prior to the trial with neck and back. No, I have no doubt that the forms filled out from Mokla are inaccurate. The question I have is it seems like Judge Hike said, I don't care what happened with Mokla because you can't rely on that. If we were to disagree with that, if we were to say Key could rely on Mokla, I'm trying to get at what happens next. Do we need to send it back for fact findings because he's arguing Mokla knew. It may not have been in the writing, but they knew because he disclosed it orally and therefore it wasn't concealment. Your Honor, I think if there's nothing in the record, maybe you do have to send it back for findings of fact on that. But I think Mr. Martins and Mr. Boyer, as I recall, both testified that he never told them that. Right. And he didn't claim that he told them about his prior settlements or claims. No, sir. Prior three. I think here credibility was a real issue with the district court. And what do we know about credibility? Who decides that? That's the district court. Right. So it would sound like if we've got one guy saying, yes, I told them about the back problem and they said no problem, and another guy saying, no, he never told me and we wouldn't have hired him if we'd known, that sounds like a fact issue and it sounds like something the district court has to resolve. That's what I'm trying to get at. I'm not trying to trick anybody. I'm trying to understand. Unless this court can just make law and say that based on the evidence of record that they were entitled to rely on. Okay. How recent was that physical exam that he took for Mock Law? I want to say in 06, Your Honor, when he went to work for them and then this accident allegedly occurred on June 20, 2008. Okay. And another issue is whether if Judge Hike found that he's entitled to maintenance and cure, which we disagree with because of the McCorfin defense and also because Judge Hike found his comment was at page 6043 of the record, was that he had serious doubts or raised serious doubts as to whether an accident even occurred. That's why it's weird that he would award punitives. I mean, we have serious doubts about the accident. We have a real question about the maintenance and cure issue in McCorfin defense, and yet there's going to be punitives awarded? How can you reconcile that? In excess of $41,000. And I just don't think, I think the record evidence is that this was not the type of egregious, wanton, and callous conduct by the employer that would allow the award of punitives and attorney's fees. And while we're on the maintenance and cure, Your Honors, Mr. Alex Doucette was the tool pusher. He was cast in judgment on maintenance and cure. He's not the employer, so I think as a matter of law that was incorrect. Your Honor, if you don't have any other questions on the maintenance issue, would you like to hear? Let me just ask you about the four years go by after he left his employment, and apparently little or no contact between the employer and Mr. Mesh? There was one letter that was allegedly sent fairly early out, Your Honor, but it never appeared in the Liberty file, and the Liberty adjuster testified that if it wasn't in the file, they didn't get it. Judge Hike found as a fact that it was almost four years after the accident, it was in 2012, that the demand for maintenance was made. Okay. Your Honor, on the maintenance and cure, Judge Hike, if it comes down to he's entitled to maintenance and cure, we don't disagree with the maintenance and the past medical award, which I think was combined with about $83,000. He found that he had an aggravation of his cervical preexisting condition, and then the last doctor to see him was my doctor, Dr. Stan Foster from Lafayette, who examined him for me six months prior to trial. He was the last doctor to see him, and Dr. Foster testified that essentially he had severe degenerative disc disease in the cervical and lumbar spine, that on that day he had basically a normal physical, considering that he didn't have any radicalopathy or anything of that nature. So Judge Hike found that at that point, based on Dr. Foster's testimony, that he had reached maximum cure on that March date, and he only gave him maintenance and cure or medical expenses for the low back. And, in fact, Judge Hike questioned Dr. Foster and asked him, he said, Dr. Foster, is it possible for an aggravation to get well? He said, oh, yeah. And I think he said, and he had a normal physical, yes. So we argued in post-trial briefs that that was the date of maximum cure, and that's what the judge found. And just a couple of things, Your Honors. On the versions of the accident, there was the accident report, and agreed he didn't sign it, but that said he opened the hatch to go in the crew boat, and this was one of those little 40-foot inland crew boats. It was a bro boat built up in Laurelville, and the hatch is in the middle, and then the two engine hatches are on either side. How much did that hatch weigh, you know? He said 100 pounds, but he also testified, Your Honor, that there was nothing wrong with the hatch, that it was a one-man job, that he didn't have any trouble seeing, that there was no foreign substance on it. He said, I keep a clean boat. I said, no oil or grease, no oil or grease. Well, lifting a 100-pound hatch that has a hinge is different from lifting 100 pounds of dead weight. It's more of a push as opposed to picking up, as you say, a barbell or something of that nature. Testimony of our marine expert was that it was a typical type setup, typical hatch, as Captain Lugabank. So he tells the adjuster the next day he picked up the hatch to check the oil, and he told Dr. Gidman the next day he was picking up the hatch and felt pain. At this point, there's no mention of wind and weather whatsoever. The first time that came up was when he went to see Dr. Adato here in New Orleans. He said there was a big wind and that a wave hit the barge and knocked him from the crew boat to between the barge and the crew boat. He told Dr. Foster that the wave came over the stern. There's a difference in his testimony as to whether he was picking up the starboard or the port hatch, and he testified at trial that the wave came over the bow like a head-on collision. That's a record at 6552. So between Dr. Foster and trial, his inconsistencies come out again because he's going from the bow to the stern, and all of his prior accidents were unwitnessed slip and falls. All of them, he said, I cut a flip. Your Honor, we have discussed at length the prior lawsuits and the prior medical in brief, and if there's no more questions from the court, I'll yield. Thank you very much. Thank you. Okay, Mr. Daniel, back to you. Thank you. Judge Davis, in response to the question that you posed to me earlier, you asked me why. Yeah, I mean you've got a real question about whether even an accident occurred out there that day, and then you've got the four-month delay. You've got two, and then whether the McCorpin defense applies. So it's just hard for me to see how it would be malicious or reckless for the employer not to pay maintenance. Certainly, and I would understand that. At first glance, it appears that way. The problem is when we deposed the adjuster, Brian Jenkins, he was the second adjuster to have had the file. A young lady named Karina West had had it before that. Now this dovetailed with Ken Houston, who is their corporate representative's testimony both prior to trial and at trial. The issue was on June 21, 2008, the day following the accident, they take his statement. The day before that on the day of the accident, they take him to see Dr. Gregory Gidman. Here's the problem. Ken Houston only read page one of Dr. Gidman's report. He saw return to work as directed. He didn't see the second page that imposed restrictions on him. Now when we deposed Dr. Gidman and his depositions in the record as part of the record at trial, he identified to him that was medium duty. Now when we deposed Brian Jenkins, we asked him, you got a tender. There was a tender made two months following the accident by the plaintiff identifying he wants medical treatment and to ask for his choice of physician. They respond, if you look at the adjuster's notes, identifying a couple things. They said, one, you're released to return to full duty. And they said you need to come back to work and go to full duty. They never offered him alternative employment. Judge Hike actually questioned Ken Houston, the corporate representative for Key at trial, and said, okay, let's assume for a second that you misunderstood, as you've testified, what the restrictions were that were imposed on Mr. Mesh. What would you typically do in that situation? Well, we'd offer him alternative employment. We'd get in touch with him and offer him. The question by Judge Hike was, well, did you do that? And he said, no. He said, we never did, even once we learned. And one of the other problems in addition to that was, after these initial tenders by the plaintiff of both the surgery as well as the request for physicians, and if you look, the briefing identifies the litany of times that it was done. Now, there's a disagreement between the parties, but Brian Jenkins' testimony is very clear as the adjuster in the file, as part of the trial testimony, that he did. And the adjuster's notes reflect a number of different tenders throughout the course of time by the plaintiff to Liberty Mutual as the carrier, and they identify very clearly that they were the ones that were, in fact, responsible for making all maintenance and cure decisions, they said, with the assistance of counsel. So the problem was Jenkins relied on Corrina West, who relied on Ken Houston's recitation and Key Energy's initial recitation of full-duty release, which he admits fully at trial, he read wrong and got it wrong, and then identified once they corrected it or once they understood that it was wrong, they did nothing. In fact, they actually terminated the plaintiff. Now, on top of that, you have a problem with medical records being given to the defendant through their counsel, and I questioned Brian Jenkins about this. I said, well, did you get them? And he said, no, the first date they actually got medical records forwarded by the defendant was June 4th, excuse me, I don't know why I said that, February 4th, 2013, which was the time that the plaintiff filed the motion to reinstate maintenance and cure. Now, only ten days after that did they actually ask for a defense medical examination with Dr. Foster. So this is not a problem that the plaintiff has created. Historically, if you look at the facts, tenders were made. They got it wrong and identified that this was a quote-unquote full-duty release without restrictions only because they failed to read the second page. My question relates to if they've got an independent reason why legally they don't owe maintenance and cure, that's what I'm asking you to address. Mr. Jenkins also testified that based on his adjuster's notes, until counsel became involved when suit was filed on April 8th, 2011, that all of the adjuster's notes reflect injured back while working on the job. Now, they disputed the neck because the day that my client gave the statement, which was June 21st, 2008, the day after the accident, he discloses prior neck. He said, yeah, I've had some problems with my neck in the past. But we've got a situation where there's really no law out there about whether the employer can rely on the previous owner's medical report. And so one of their arguments to the trial court and to us was we had a McCorpin defense. So why isn't that at least an arguable basis not to pay maintenance? Because they didn't investigate it at that point, Your Honor. They didn't investigate any of that until the motion to reinstate maintenance and cure was filed on February 15th, 2013. That's the problem. In fact, I filed a motion to quash their request for an independent medical exam because they did it after I filed to reinstate maintenance and cure. So the problem was they sat on all of this information even if you want to consider that the plaintiff had been dilatory. And I think the combination of sitting on the information aside in addition to the fact that they read the restrictions initially wrong or what the court was relying on because you didn't have them. In fact, at the hearing on the motion to reinstate maintenance and cure, the judge, Judge Hike, asked counsel. He said, have you raised your McCorpin defense? He goes, no. He said, well, you need to amend and do that. We were actually beyond the amendment deadline at that point, but the judge allowed him to go back and amend since it was a bench trial. So you're here at 2013, and you don't even have a pleading raising that as an affirmative defense. So we have a real problem between overlooking what the restrictions actually were. Then once you get the information, not passing it to the adjuster to make the decision, then once we file the motion to reinstate maintenance and cure, they have to be prompted by the court to raise the McCorpin defense beyond the amendment deadline. Okay, I think we have your argument, then. Thank you very much. Thank you, counsel. We have your case.